*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

October 26, 2022

**BY ECF**

The Honorable Sidney H. Stein
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

  Re: *United States v. Rakim Brown*, S4 19 Cr. 513 (SHS)

Dear Judge Stein,

  The Government respectfully submits this letter in advance of sentencing in this matter, currently scheduled for November 2, 2022 at 11:00 a.m. As set forth in the parties' plea agreement and the Final Presentence Investigation Report ("PSR"), the applicable United States Sentencing Guidelines ("U.S.S.G." or "the Guidelines") sentence is 183 to 198 months' imprisonment, with a mandatory minimum term of 10 years' imprisonment. For the reasons explained below, the Government submits that a Guidelines sentence of 183 to 198 months' imprisonment would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

**A. Factual Background**

  The defendant was a member of a drug crew that sold crack cocaine and engaged in acts of violence (the "Davidson Crew"). (PSR ¶ 16). The Davidson Crew (which included his father, Robert Brown, Sr., and brothers, Rakeim Murray and Robert Brown, Jr., among others) primarily sold drugs in the vicinity of Davidson Avenue in the Bronx. Another drug crew operated one to two blocks west in the vicinity of Grand Avenue and Aqueduct Avenue. This crew (the "Rival Drug Crew") sold heroin and crack cocaine. (PSR ¶ 16). Although each crew had its own block on which they sold drugs, they also sold narcotics in buildings located on the cross-streets between the blocks. As such, members of the two crews frequently observed each other on the block—whether making narcotics sales or going into buildings or bodegas to make sales. (PSR ¶ 16).

  Tensions between the crews grew after a former member of the defendant's drug crew ("CW-1") began selling narcotics for the Rival Drug Crew, and the Rival Drug Crew's narcotics distribution began to grow. (PSR ¶ 17). Then, in April 2017, members of the Rival Drug Crew shot the defendant's brother and crew member, Rakeim Murray, which left him paralyzed. (PSR ¶ 17).

<u>Past Narcotics Arrests and Convictions</u>

The defendant and his brother, Rakeim Murray, an unindicted co-conspirator, were arrested several times with narcotics and narcotics proceeds that were part of the charged conspiracy, as detailed below. (PSR ¶ 18).

On November 7, 2015, an officer with the New York City Police Department ("NYPD") observed the defendant and Murray in the lobby of a building on Davidson Avenue in the Bronx, and further observed Murray sell what appeared to be a quantity of crack cocaine to another individual. (PSR ¶ 19). Murray was placed under arrest and found to be in possession of seven baggies of crack cocaine. (PSR ¶ 19). The defendant was present for the arrest. (PSR ¶ 19).

On August 5, 2016, an NYPD officer conducted a traffic stop of a taxicab, in which the defendant was a passenger, on the corner of Jerome Avenue and 184th Street in the Bronx. (PSR ¶ 20). The officer recovered 52 baggies of crack cocaine, totaling 6.4 grams of crack cocaine, from the defendant. (PSR ¶ 20).

On July 27, 2017, after being placed under arrest for possession of a firearm, an NYPD officer transported the defendant back to the 52nd Precinct and searched him for contraband. (PSR ¶ 21). During that search, the officer recovered from the defendant's person 25 baggies of crack cocaine, totaling 7.6 grams of crack cocaine. (PSR ¶ 21). The defendant pleaded guilty to possessing crack cocaine from the July 2017 stop in Bronx County Criminal Court in May 2019. (PSR ¶ 21).

On December 7, 2017, an officer encountered the defendant and several others drinking from open containers on the corner of Davidson Avenue and 183rd Street. (PSR ¶ 22). The defendant pulled out a Percocet pill and stated that that was all he had on him. (PSR ¶ 22). The officer searched the defendant and recovered from his person 25 baggies of crack cocaine, totaling 7.7 grams of crack. (PSR ¶ 22).

On March 3, 2018, NYPD officers conducted a traffic stop of a car that was blocking the crosswalk on the corner of Walton Avenue and 184th Street in the Bronx. (PSR ¶ 23). The defendant and three others were inside the vehicle. (PSR ¶ 23). The officers detected the smell of marijuana and asked the defendant why that was the case. (PSR ¶ 23). The defendant stated that they had just finished smoking. (PSR ¶ 23). The officers searched the car, recovering 75 baggies of crack cocaine under the backseat cushion, totaling 6.9 grams of crack cocaine, multiple bags of marijuana, a quantity of heroin, and $2,450 in cash. (PSR ¶ 23).

Finally, on May 8, 2019, the defendant pleaded guilty in Bronx Supreme Court to two counts of possession of a controlled substance in the seventh degree, in violation of N.Y. Penal Law § 220.03, for possessing cocaine on July 27, 2017, and for possessing oxycodone on December 7, 2017. (PSR ¶ 24). The defendant was sentenced to a Conditional Discharge. (PSR ¶ 24).

## Acts of Violence

On April 27, 2017, Murray (the defendant's brother and crew member) threatened and attempted to injure CW-1, who was pregnant at the time. CW-1 called Brito to tell him what had happened. (PSR ¶ 25). Brito came to the block with a gun, which he put in CW-1's bag. (PSR ¶ 25). Brito then approached Murray, took the gun out of CW-1's bag, and shot Murray, which left him paralyzed. Brito left the neighborhood to avoid being arrested. (PSR ¶ 25).

After Brito shot the defendant's brother, the defendant sought to retaliate against Brito and the Rival Drug Crew. (PSR ¶ 26). On July 17, 2017, the defendant threatened another member of the Rival Drug Crew ("CW-2") with a firearm. (PSR ¶ 26). On that occasion, CW-2 was driving with CW-2's family in the neighborhood when CW-2 noticed the defendant on a bicycle. (PSR ¶ 26). The defendant and CW-2 crossed paths, but then the defendant was following CW-2. The defendant pulled out a firearm and pointed it at CW-2. (PSR ¶ 26). No one was shot that night. (PSR ¶ 26).

On January 28, 2018, the defendant and multiple members of the Davidson Crew cornered CW-1 in a hair salon located on Davidson Avenue. (PSR ¶ 29). CW-1 and another individual ("Witness-1") tried to flee in a taxi. (PSR ¶ 29). However, the defendant and other crew members chased them by vehicle across the Bronx. CW-1 and Witness-1 ultimately fled to an apartment building. (PSR ¶ 29). While CW-1 and Witness-1 were in the vestibule of the building, the defendant ran into the room with them, beat CW-1 in the face with the butt of the firearm, and fired at CW-1's legs multiple times. (PSR ¶ 29). Specifically, CW-1 sustained a laceration to the cheek, caused by the defendant hitting CW-1 with the butt of the firearm. (PSR ¶ 29). The defendant also discharged the firearm in the vestibule, causing debris from the vestibule or ricocheting bullets to hit CW-1 in the leg, from which CW-1 sustained additional injuries. (PSR ¶ 29). CW-1 sustained injuries to the face and legs as a result. (PSR ¶ 29).

## Obstruction of Justice

The defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice when the defendant made false statements during a suppression hearing approximately in February 2022, a week before pleading guilty. (PSR ¶ 36). Specifically, Brown took the witness stand and falsely testified at length that law enforcement planted crack on him during the August 2016, July 2017, and December 2017 stops. (PSR ¶ 36). Indeed, the defendant even lied directly to the Court when the Court asked questions of him:

> Q. Now at the time of your arrest you did have crack on you, didn't you?
> A. No.
>  . . . .
> Q. The next day you were notified that law enforcement officers recovered crack, is that correct?
> A. When I was in central booking, yes, I seen I was being charged with it, yes.
>  . . . .
> Q. They planted crack?
> MS. GLAVIN: Objection.

>    THE COURT: I'll allow that. Is it your position that they planted crack?
>    THE WITNESS: I never had anything of that type of nature on me.

Suppression Hearing Transcript ("Supp. Tr.") at 569:25-571:1.

>    Q. Now Mr. Brown, you stated that you didn't have drugs on you the evening of December 17 -- December 7, 2017, is that right?
>    A. Yes.
>    Q. You don't dispute that you've had crack on you on other occasions, correct?
>    A. When I have been stopped? No, I never had any type of crack on me.
>    Q. You never had crack on you?
>    A. Yes, when I -- yes.
>    Q. Isn't it true that you pleaded guilty in Bronx Criminal Court for possessing crack on July 27, 2017?
>    A. Yes, I did plead guilty, and part of my -- to be honest with you, the reason why I --
>    Q. Yes or no.
>    A. Yes, I did, yes.
>    Q. You pled guilty to possessing crack that day, correct?
>    A. Yes.

Supp. Tr. 576:8-24.

>    Q. You had crack on you when law enforcement officers pulled over the taxi, right?
>    MS. GLAVIN: Objection, asked and answered.
>    THE COURT: I'll allow it.
>    A. No.
>    THE COURT: Next.
>    Q. Did you see any crack that night?
>    A. No.
>    Q. So once again your testimony is that law enforcement officers fabricated the fact that you had crack on you?
>    A. Absolutely, yes.

Supp. Tr. 584:19-585:1-4.

The defendant's perjury did not end with lying extensively on cross-examination. He then repeatedly lied on redirect and fabricated a false story about why he had previously pleaded guilty to crack possession in the state.

>    Q. You were asked some questions by the AUSA about a guilty plea you entered in connection with the July 27, 2017 arrest. Do you remember that?
>    A. Yes.
>    . . . .
>    Q. Can you explain why you pled guilty to that?

>A. Well, at the time I had my lawyer, John Cromwell, and he basically was telling me like -- because I wanted to move forward with it and go to trial with it, and he was basically telling me like this case is like -- excuse my language, but this is bullshit, just take the misdemeanor and go about your day. And I didn't really have the money at the time, my family, like to keep paying the lawyers. So he just said take this, take this plea and then you're not going to do jail time, you will continue going to work and you will continue to be with your family, take this and go. And honestly speaking, at the time I didn't want to take it, and my father was there and he told me not to take the plea because I didn't do in anything wrong. But I didn't listen to him and I wind up taking the plea because he said you won't do any jail time and you can continue to work and build your family, and I went and took the plea.

Supp. Tr. 597:5-598:8.

## Procedural History and Plea Agreement

On July 15, 2019, Mr. Brown was charged in a two-count indictment with (1) conspiracy to distribute crack cocaine from at least in or about 2016 to in or about 2018, in violation of 21 U.S.C. §§ 846, 841(b)(1)(C); and (2) between at least April 2017 up to and including at least 2018, possession, brandishing and discharge of a firearm in furtherance of the crack cocaine conspiracy, in violation of 18 U.S.C. § 924(c)(1)(A)(i), (ii), (iii).

On or about January 11, 2022, the Government filed an S4 Indictment containing eight counts: (1) Count One charged a crack cocaine distribution conspiracy from 2014 to 2018, in violation of 21 U.S.C. §§ 846, 841(b)(1)(B); (2) Count Two charged possession of crack cocaine on or about August 5, 2016, in violation of 21 U.S.C. §§ 812, 841(a)(1) and 841(b)(1)(C); (3) Count Three charged possession of crack cocaine on or about July 27, 2017, in violation of 21 U.S.C. §§ 812, 841(a)(1) and 841 (b)(1)(C); (4) Count Four charged possession of crack cocaine on or about December 7, 2017, in violation of 21 U.S.C. §§ 812, 841(a)(1) and 841 (b)(1)(C); (5) Count Five charged possession, brandishing and discharge of a firearm between 2016 and 2018 in further of the narcotics conspiracy charged in Count One, in violation of 18 U.S.C. § 924(c); (6) Count Six charged a Hobbs Act robbery of a rival drug dealer on July 27, 2017, in violation of 18 U.S.C. § 1951; (7) Count Seven charged possession and brandishing of a firearm in further of a crime of violence charged in Count Six, in violation of 18 U.S.C. § 924(c); and (8) Count Eight charged obstruction under 18 U.S.C. § 1512.

On or about March 2, 2022, approximately one week before trial, the defendant pleaded guilty pursuant to a written plea agreement to conspiring to distribute crack cocaine from in or about 2014 to in or about 2018, in violation of 21 U.S.C. § 841(b)(1)(C), and possessing a firearm in furtherance of a narcotics conspiracy, which was brandished and discharged, in violation of 18 U.S.C. § 924(c). (PSR ¶ 12). In connection with the defendant's guilty plea, he admitted, among other things, that he "shot at an individual on January 28, 2018." (Plea Tr. at 23).

**B. Disputes Regarding the PSR**

### 1. The Defendant Sold Drugs with His Brothers and Father (PSR ¶¶ 16, 18, 19)

The defendant first "disputes that his father and brothers were part of a crack-cocaine conspiracy with him." Def. Submission at 6. This dispute is immaterial to sentencing. In any event, the defendant's older brother, Rakeim Murray, was a member of the Davidson Crew. As set forth in the PSR, Rakeim Murray was arrested on November 7, 2015 while selling a significant quantity of crack cocaine in the Davidson Crew's territory. (PSR ¶ 19). Although the defendant claims this arrest is irrelevant, CW-2 testified that the Davidson Crew controlled the drug territory on Davidson Avenue where Murray was arrested. *See* Fatico Transcript ("Fatico Tr.") at 17:2-5 ("THE COURT: I see Davidson. Whose area is Davidson, yours or Ra's? THE WITNESS: Davidson is Ra's [the defendant's] area, where they be at standing and selling drugs."). The fact that Murray sold crack in the territory of the Davidson Crew and the defendant was physically present for his brother's arrest is clear evidence of their participation in the same conspiracy.

### 2. The Defendant's Resolutions with the Bronx District Attorney's Office (PSR ¶¶ 20, 21, 22, 54, 55)

The defendant next asks the Court to add irrelevant facts to the PSR about resolutions between the defendant and the Bronx District Attorney's Office (the "BXDA") in connection with the defendant's narcotics arrests. The BXDA is a separate prosecutorial body with different resources and caseloads. Decisions of individual prosecutors within the BXDA have no bearing on the defendant's sentencing in this case.

### 3. Shooting of Rakeim Murray by CW-1's Boyfriend (PSR ¶ 25)

The defendant next disputes the reason for why his brother, Rakeim Murray ("Keim"), was shot by CW-1's boyfriend, Maximiliano Brito, a/k/a "Choco." The reason for why Murray was shot is irrelevant to sentencing. In any event, the defendant's alternative narrative is patently incredible. The Court questioned CW-2 about the motive for the Murray shooting during the *Fatico* hearing:

> THE COURT: Do you know why Choco shot Keim?
> THE WITNESS: Choco -- it was all over -- because one of them kicked his --
> Choco's baby mom. She was pregnant at the time. Ra or his brother, one of them
> kicked her while she was pregnant. Choco got into an argument with them and
> Choco was mad. So Choco, he had an argument with them. They walked off.
> Choco stayed in the Bronx on 183rd waiting for them to come back. And when
> they came back, a bunch of them, it was a bunch of them. It was Ra, his brother
> and a few others, and then that's when Choco did what he did.

Fatico Tr. 23:15-24. Although CW-2 was not physically present for the shooting, he testified that he learned of the motivation because he was on the phone with Brito immediately before the shooting occurred.[1]

The defendant, on the other hand, claims that "CW-1 had attempted to rob another woman in the neighborhood and Mr. Murray, upon learning this, confronted her and told her not to bully others in this manner." Def. Submission at 9. The defendant—who has pleaded guilty to committing perjury—does not claim to have been present for the confrontation and fails to cite any source for this information. Indeed, the defendant's alternative explanation is all the more incredible given that CW-1 was *eight months* pregnant at the time of the shooting. The defendant is under no obligation to prove or argue anything at sentencing. However, his so-say alone does not create a factual dispute.

### 4. The Defendant's Brandishing of a Firearm at CW-2 (PSR ¶ 26)

The defendant disputes that he brandished a firearm at CW-2 on July 17, 2017. Def. Submission 10-13. The Government submits that it has carried its burden through the testimony of CW-2, and that the Court should find that the defendant threatened CW-2 in connection with the ongoing drug rivalry between the defendant's drug crew and CW-2's crew.

Disputed facts relevant to sentencing determinations need only be found by a preponderance of the evidence. *See United States v. Garcia*, 413 F.3d 201, 220 n.15 (2d Cir. 2005) ("Judicial authority to find facts relevant to sentencing by a preponderance of the evidence survives Booker."); *United States v. Vaughn*, 430 F.3d 518, 526-27 (2d Cir. 2005).

During an hours-long Fatico hearing, CW-2 testified in a credible, calm and careful manner. He explained the relationship between Rah's drug crew and his drug crew, and described how after Choco shot Keim – a fact that is not in dispute – things "changed a lot. The tension is there, like, you know, like now it's on. Like, the drama is on. The beef is on." Fatico Tr. 22:14-15. It was within this climate that Rah – a leader of his own drug crew – decided to threaten CW-2 and brandish a weapon at CW-2 and CW-2's family.

CW-2 explained how he remembered the day clearly, as it was his wife's birthday. Fatico Tr. 25:19. CW-2 was driving with his wife and young daughter when he saw the defendant on a black mountain bike. Fatico Tr. 29:15. While at first CW-2 was not concerned, Fatico Tr. 29:18-19, CW-2 became concerned when he saw he defendant again, this time on Aqueduct, "pointing a gun at [CW-2's] car." Fatico Tr. 33:3-4. At that time, CW-2 told his wife and daughter to get down. CW-2 explained that he "sped off" as the defendant tried to catch up to him. CW-2 remembered the route he took that day to try and escape the defendant. CW-2 explained that he was worried the defendant could catch him because "you got stop signs. You got red lights. You

---

[1] *See* Fatico Tr. 24:4-12 ("THE COURT: Were you there, sir? THE WITNESS: At this time, I got a phone call. I was speaking to Choco on the phone. I was trying to get him to come upstairs to one of the cribs that we be at where we bag up at, where we hang out at. Q. Mr. Hartley, were you present on the street and did you see the shooting? A. No, I wasn't present on the street. I was speaking to Choco on the phone to try to get him to come upstairs.").

got people. It's early afternoon. You got civilians – could be walking in the street. Cars possibly could be double-parked." Fatico Tr. 37:10-13. In other words, it was possible – as CW-2 explained – for the defendant to stay close to CW-2, even though CW-2 was in a car and the defendant was on a bike.

The defendant argues that CW-2's allegation "defies common sense and credulity" given that CW-2 was a large-scale heroin dealer. Def. Submission 10. But this argument overlooks that, a mere six months later, the defendant was brazen enough to shoot at CW-1, who had been in a relationship with Choco (a former member of CW-2's drug crew) and was the mother of Choco's child. Fatico Tr. 12:22-23. This argument also overlooks that the defendant was not just some small-time drug dealer. Rather, the defendant controlled a drug block; he and his crew sold up and down Davidson, just one block over from CW-2's area. Fatico Tr. 17:16-19. If the defendant were so intimidated by CW-2 as the defendant claims, then there is no reason CW-2 would allow the defendant to continue selling drugs so close to CW-2's area. But, the evidence presented at the Fatico hearing, the Suppression hearing, and through the defendant's own guilty plea, established that the defendant was a drug dealer in the neighborhood, plain and simple.

The defendant also points to the lack of retaliation following the incident as another reason why CW-2 should not be credited. Def. Submission 12. But CW-2 credibly explained the reason he did not retaliate:

> I mean, at this point in time, like, you know, the beef is on. We making money, a lot of money. I'm thinking for the defendant because if I really wanted to, you know, do something to him or could have done something to him, I could have done it. But I'm thinking about my life, I'm thinking about, you know, not coming to jail for nothing stupid really. So that's why I did not – that's why no retaliation happened back towards him.

Fatico Tr. 140:20-141:2. In other words, CW-2 wanted to keep selling drugs and making more money. If he had retaliated against the defendant, that would have brought police attention to the block and possibly resulted in his arrest – all of which would have been bad for his lucrative drug business.

Finally, the defendant argues that CW-2's motivations for testifying for the Government suggest this incident did not happen. Def. Submission 13. In short, the defendant has raised a classic "cooperating witness" argument – suggesting that CW-2 has made up a story to help himself at sentencing. But the Court is familiar with the way the Government's cooperation agreements works. Because CW-2 pled guilty pursuant to a cooperation agreement, his sentencing exposure went *up* –i.e., he is now facing more jail time than he was previously. Moreover, if CW-2 were just making up a story (and he is not), it seems likely his story would have been more sensational. CW-2 could have alleged that the defendant fired the gun; or that the defendant chased him on foot. Instead, he has told the Court – again, calmly, credibly, and with composure – what he recalls from that day five years ago. The defendant has set forth no persuasive reason to believe CW-2 is lying. Thus, the Government has satisfied its burden of proving this incident by a preponderance of the evidence.

### 5. The Robbery of CW-3 (PSR ¶¶ 27–28)

The Government has already notified the defendant that it is not pursuing the robbery of CW-3 at sentencing.

### 6. The Defendant's Shooting at CW-1 (PSR ¶ 29)

The defendant next asserts that he did not intend to kill CW-1 during the January 28, 2018 shooting. Def. Submission at 14. The PSR, however, does not state that the defendant intended to kill CW-1. Instead, it is plain that the defendant intended to beat her and then paralyze her by shooting at her legs repeatedly. As set forth in the PSR, the defendant cornered CW-1 in a vestibule, beat CW-1 in the face with the butt of the firearm, and fired at CW-1's legs multiple times. (PSR ¶ 29). Specifically, CW-1 sustained a laceration to the cheek, caused by the defendant hitting CW-1 with the butt of the firearm. (PSR ¶ 29). The defendant also discharged the firearm in the vestibule, causing debris from the vestibule or ricocheting bullets to hit CW-1 in the leg, from which CW-1 sustained additional injuries. (PSR ¶ 29). CW-1 sustained injuries to the face and legs as a result. (PSR ¶ 29).

### 7. The Defendant's Witness Tampering (PSR ¶ 30)

The Government has already notified the defendant that it is not pursuing the witness tampering of CW-1 at sentencing.

### 8. The Defendant's Perjurious Testimony at the Suppression Hearing (PSR ¶ 31, 37)

The defendant disputes that he submitted a false affidavit in support of his motions to suppress. Def. Submission at 15. The Court need not resolve the issue because the defendant has pleaded guilty to committing perjury by repeatedly lying under oath that law enforcement officers planted narcotics on him during the August 2016, July 2017, and December 2017 stops. (PSR ¶ 36).

## C. Discussion

### 1. Applicable Law

As the Court is well aware, the Sentencing Guidelines still provide strong guidance to sentencing courts following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 128 S. Ct. 586, 594 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 596. After that calculation, however, the Court must consider the seven factors outlined in Title 18, United States Code, Section 3553(a), which include the nature and circumstances of the offense, the individual characteristics of the defendant, and the need to adequately deter criminal conduct and promote respect for the law. *Id.* at 50 & n.6.

**2. The Powder-to-Cocaine Base Sentencing Disparity**

As the Court is aware, and as defense counsel discusses, on June 22, 2021, the U.S. Department of Justice provided public testimony in support of the EQUAL Act, S.79. This proposed legislation would eliminate the powder-to-cocaine base sentencing disparity in 21 U.S.C. §§ 841 and 960. Although the Department supports elimination of the powder-to-cocaine base disparity, until legislation to that effect is passed, the current statutory and guidelines provisions remain in effect. The Court can and should, consistent with the law and current sentencing framework, consider the powder-to-cocaine base disparity in assessing the Section 3553(a) factors. *See Kimbrough v. United States*, 552 U.S. 85, 106-08 (2007); *United States v. Cavera*, 550 F.3d 180, 191-92 (2d Cir. 2008) (en banc). However, based on all the relevant factors under Section 3553(a) described herein, the Government believes that in this case, a Guidelines sentence of 183 to 198 months' imprisonment remains appropriate.

**3. A Guidelines Sentence Is Appropriate in This Case**

In this case, the Guidelines sentence of 183 to 198 months' imprisonment is appropriate. The sentencing factors particularly applicable here include the need for the sentence to reflect the nature and seriousness of the offense, to protect the public from further crimes of the defendant, and to afford adequate deterrence to this defendant. 18 U.S.C. § 3553(a)(2)(A)-(C). These considerations weigh in favor of a sentence within the Guidelines range.

The defendant repeatedly targeted members of a rival drug gang for nearly nine months between April 2017 and January 2018, although his participation in his own drug crew was for much longer. In June 2017, he attempted to run down and shoot CW-2, the leader of the Rival Drug Crew while the leader drove through the Bronx with his wife and young child. Then, in January 2018, he ran down, beat, and repeatedly shot at CW-1 while she and an innocent bystander cowered in a vestibule. The direction of the defendant's shots—repeatedly at CW-1's legs—clearly evidenced his intention. He wanted to paralyze CW-1 in retribution for his brother's shooting.

The January 2018 shooting is shocking in its degree of planning and execution. Upon learning that CW-1 was in the Bronx, the defendant and his drug crew traveled to CW-1's location (a local beauty salon) and stationed themselves outside. The defendant and his crew members then jumped into cars and chased CW-1 and her friend through the Bronx after CW-1 and her friend attempted to flee in a taxi. The defendant followed the two women back to an apartment building, where the defendant cornered the two women in a vestibule. He then pulled out a firearm, viciously beat CW-1, and shot at her legs. A photo of CW-1's facial injuries is set forth below. A video of the shooting and beating is incorporated herein as Exhibit A.[2]

---

[2] A copy of the video will be provided to the Court separately.



The defendant's complete disregard for the law did not end with his arrest and indictment in 2019. During the parties' suppression hearing in February 2022, he took the witness stand and lied under oath during cross-examination that law enforcement planted crack on him on at least three separation occasions. *See* Supp. Tr. 569:25-571:1; *id.* at 576:8-24; *id.* at 584:19-585:1-4. He further used his attorney's redirect (without his attorney's knowledge) to fabricate additional lies that he pleaded guilty to possessing crack cocaine in the past because his prior attorney coerced him into doing so. *Id.* at 597:5-598:8.

Lying under oath is an attack directly on the administration of justice. The defendant chose to take the witness stand and repeatedly perjure himself for almost an hour in response to questions from the parties and the Court. If the oath is to have any meaning—and the principles of specific and general deterrence protected—the Court must impose a more severe incarceratory sentence than the mandatory minimum sentence for his deliberate and willful actions.

The Court should further reject any argument that the defendant's violence is somehow mitigated by the shooting of his brother. We live in a country of laws. We do not live in a society of vigilante justice served at the barrel of a gun. The defendant at any time could have gone to the police to assist them with the prosecution of the people who shot his brother. Instead, he decided that he would harm the people he thought were responsible. His actions run counter to every fiber of the principles of respect for the law and deterrence, as set forth in Section 3553(a).

To be clear, the defendant also had multiple opportunities to leave his life of crime behind. This is the defendant's fifth criminal conviction. (PSR ¶¶ 52-55). In July 2013, the defendant and his brother attempted to rob a vehicle-for-hire at knife point. (PSR ¶ 52). He then got into a fight with six other apprehended individuals in March 2014 while he was in Bronx County Criminal

Court. (PSR ¶ 53). The defendant thereafter was twice arrested with crack cocaine in July 2017 and December 2017. (PSR ¶¶ 54-55). Following each arrest, the defendant was placed on pretrial supervision and subjected to court supervision after he was sentenced. (PSR ¶¶ 52-55). The defendant nonetheless disregarded his supervision by continuing to sell crack cocaine between 2014 and 2018.

The Court should further reject the defendant's argument that a sentence within the Guidelines range would create a sentencing disparity under 3553(a). The defendant attempts to compare his conduct to that of Reginald Sanders, who was a member of the Rival Drug Crew. Def. Submission at 17. But Sanders (unlike the defendant) was not charged with committing any acts of violence. Indeed, Judge Engelmayer made clear on the record at sentencing, "I fully credit that there is no evidence, zero evidence that the gun you possessed was discharged. There's no reason to assume that you intended to shoot anyone." *See United States v. Sanders*, 18-cr-00390-PAE, Dkt. 418, 31. Sanders likewise did not commit perjury on the witness stand.

The defendant likewise incorrectly compares his conduct to that of Thomas Jimenez, who defense counsel represented in a Newburgh Latin Kings racketeering case nearly ten years ago. Def. Submission at 18. But as defense counsel knows from their own sentencing submission in that case, Jimenez participated in the charged conspiracy for just six months and never attempted to injure anyone. *See United States v. Jimenez*, 10 Cr. 392, Dkt. 735, at 10 ("Mr. Jimenez was part of the Newburgh Latin Kings for approximately six months"); *id.* at 5 ("With respect to the November 13, 2009 incident, it is important to note that Mr. Jimenez neither aimed nor brandished the gun in connection with that incident"). The defendant, on the other hand, participated in the charged crack cocaine conspiracy for four years, attempted to paralyze one of his drug rivals (a mother with a young child), brandished his firearm at another drug rival (who was in his car with his wife and young child), and perjured himself at length during the parties' suppression hearing. Thus, Jimenez and the defendant are not similarly situated.

**D. Conclusion**

For these reasons, the Government respectfully requests that the Court impose the Guidelines sentence of 183 to 198 months' imprisonment.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

By: _____/s/_____
Mathew Andrews
Christopher Brumwell
Alexandra Rothman
Assistant United States Attorneys
(212) 637-6526

cc: Rita Glavin, Esq. (by ECF)